# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TUITIONFUND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-00069 |
| | ) | Judge Sharp |
| SUNTRUST BANKS, INC. *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**************************************************************************

| | | |
|---|---|---|
| TUITIONFUND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-00852 |
| | ) | Judge Sharp |
| FIRST HORIZON NATIONAL | ) | |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ON CLAIM CONSTRUCTION

This is a patent infringement action in which Plaintiff Tuitionfund LLC claims that certain competitors, along with a slew of banks that are the competitors' customers, have infringed on three patents that relate to merchant-funded rewards programs. On February 1, 2013, and after the parties filed extensive briefing in relation to their respective positions, the Court held a claim construction hearing in accordance with Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

## I. FACTUAL BACKGROUND

TuitionFund alleges infringement of U.S. Patent No. 7,499,872 ("the '872 patent"), U.S.

Patent No. 7,653,572 ("the '572 patent"), and U.S. Patent No. 7,899,704 ("the '704 patent") (collectively, "the patents-in-suit"). The patents-in-suit involve programs that assist consumers saving for higher education by placing rebates from certain purchases in a specialized rebate account. The rebates are funded by merchants who are registered with the program manager and are based upon purchases made by the consumer. The patents-in-suit each discuss the flow of information and money in a particular type of rebate program.[1]

At the time of the initial filing of the '872 patent on November 1, 2000, the use of rebate programs involving credit or debit card purchases was not novel. Indeed, credit card companies, such as Discover, and merchants, such as Sears, were already successfully managing rebate programs. Generally, those rebates were funded by the bank or other institution issuing the credit card or debit card in order to promote use of that particular card.

Over time, merchant-funded rebate programs became increasingly popular. Under such programs, merchants (*e.g.*, retailers) pay the rebate in order to encourage patronage of their stores. Many merchant-funded rebate programs require the use of specialty or loyalty cards that are specifically tied to the particular merchant.

Against this backdrop, Michael P. Thompson, the President of TuitionFund and inventor of the patents-in-suit, devised systems for a merchant-funded rewards program that did not require the

---

[1] The '872 patent was the first of the three patents-in-suit to be granted. Thereafter, TuitionFund filed and prosecuted numerous continuation applications. The patents that resulted from these continuation applications, including the '572 patent and the '704 patent, contain many of the claim limitations that are found in the '872 patent. In other words, while the patents-in-suit originate from the '872 patent and share a common specification and figures, each patent claims different aspects of the inventive system.

3

use of special purpose or loyalty cards. The thought was that both consumers and shopkeepers would benefit, as the former would be rewarded with rebates (and effectively save money) while using their regular credit and debit cards, and the latter would be rewarded through continued customer loyalty.

The system Thompson devised envisioned a rebate network manager, connected to one or more registered merchants via processors that track debit and/or credit card account transactions. As described in the patents-in-suit, "members" join the TuitionFund rebate program through the TuitionFund.com website. At the site, the members register their existing credit and/or debit cards by giving TuitionFund numbers associated with those cards. Upon registering with TuitionFund, the members earn rebates on purchases with registered merchants, *i.e.*, participating merchants. As purchases are made, a participating merchant's transactions are routed to a "rebate network manager" that monitors transactions from the participating merchants and determines which of the transactions were made by registered members and which were made by non-registered members. The rebate network manager then calculates rebates for registered member purchases, and deposits all or a portion of the rebate into a "special" account for the registered member that is used specifically for saving for higher education.[2]

Just by way of example, the technology is illustrated in claim 1 and figure 4 in the '572 patent. Claim 1 recites "a method of providing a rebate program, the rebate program including registered members, registered member credit card accounts, registered member debit card accounts,

---

[2] As initially envisioned, the rebate program would be used to fund savings for education, but broader applications are possible.

and registered member rebate accounts in which to apply rebates earned by registered members."

Figure 4 illustrates the technology:



Block 400 of Figure 4 represents a TuitionFund.com Member with a valid registered credit card; block 450 represents the consumer's registered member rebate account where rebates are credited; and block 420 represents a registered merchant which could be an on-line retailer, such as Amazon.com, or a traditional retailer such as Lowes.

The body of claim 1 recites four method steps. Step (a) involves receiving debit and credit card account transaction information associated with a registered merchant. This step occurs at the rebate network manager, which is connected directly or indirectly to the merchant by way of

5

processors that track debit and/or credit card purchases. In other words, the rebate network manager (block 430) is connected to a registered merchant (block 420) by way of processors that track transactions (represented by the arrow connecting block 420 to block 430). In step (b), the rebate network manager's centralized processing system monitors all information received from the processors discussed in step (a) to determine if the transactions involved a registered member using a registered card account. If the transaction being monitored was at a registered merchant by a registered member using a registered card account, then a rebate is calculated, as recited in step (c). Finally, in step (d) the information needed to apply the rebate to a registered member's rebate account is generated.

In accordance with the Supplemental Case Management Orders in these consolidated actions, the parties submitted a claim construction chart (Case No. 3:11-0069, Docket No. 222-1), containing 15 claim terms and/or phrases. After reviewing the patents-in-suit and the and the claim construction briefing, the Court identified four terms for construction at this point, and so informed the parties at the <u>Markman</u> hearing. The Court will focus on those terms after setting forth the general principles relating to claim construction.

## II.  GENERAL PRINCIPLES RELATING TO CLAIM CONSTRUCTION

Claim construction is a two-step process. In the first step, which the Court undertakes now, the Court determines, as a matter of law, the scope of the patent claim. <u>See</u> <u>Markman</u>, 517 U.S. at 384, 388; <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1368 (Fed. Cir. 2003); <u>Teleflex, Inc. v. Ficosa North Am. Corp.</u>, 299 F.3d 1313, 1323 (Fed. Cir. 2002). Once that scope is determined, the allegedly infringing device is compared to the patent claims, and, if necessary, a jury (or a court in

6

a bench trial or on summary judgment) determines, as a matter of fact, whether all of the limitations

of at least one claim are present, either literally or by a substantial equivalent, in the accused device.

Teleflex, Inc., 299 F.3d at 1323; Southwall Tech. v. Cardinal IG Co., 54 F.3d 1570, 75 (Fed. Cir.

1995).

"[A] patent must describe the exact scope of an invention and its manufacture to 'secure to

[the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them.'"

Markman, 517 U.S. at 373 (citation omitted).  This is accomplished in the claim(s) and the

specification(s) which are set forth in the patent document and required by statute.[3]

"It is well-settled that, in interpreting an asserted claim, the court should look first to the

intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in

evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.

Cir. 1996).  "Such intrinsic evidence is the most significant source of the legally operative meaning

of disputed claim language," and, therefore, resort to extrinsic evidence such as expert opinions and

---

[3]  Section 112 of title 35 provides:

The specification shall contain a written description of the invention, and of the manner and
process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to
make and use the same, and shall set forth the best mode contemplated by the inventor of
carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and
distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or
multiple dependent form.

35 U.S.C. § 112.

7

dictionaries is improper unless the analysis of the intrinsic evidence does not resolve any ambiguities in the claim terms. Id. at 1583.

"All intrinsic evidence is not equal however." Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001). Rather, a court looks first to the claim language. Id. "If the claim language is clear on its face, then . . . consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." Id. "If however the claim language is not clear on its face, then . . . consideration of the rest of the intrinsic evidence is directed to resolving, if possible, the lack of clarity." Id.

In construing a disputed claim term, the term is given its "ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). This "provides an objective baseline from which to begin claim interpretation," because "patents are addressed to and intended to be read by others of skill in the pertinent art." Id.[4]

"If the meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the claim has been construed." Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1332 (Fed. Cir. 2001). "If however a claim limitation is still not clear, [a court] may look to extrinsic evidence to help resolve the lack of clarity," id, and to assist the court in "comprehending

_____

[4] "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. The specification can be highly relevant to the claim construction analysis because, by way of examples, the inventor may define his own terms in the specification, or "[t]he patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Teleflex, 299 F.3d at 1325; see, Interactive Gift, 256 F.3d at 1331 (citation omitted) .

8

the technology in accordance with the understanding of skilled artisans[.]" Altiris, Inc., 318 F.3d at 1369. "Extrinsic evidence may never be relied upon, however, to vary or contradict the clear meaning of terms in the claims." Id. "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude." Southwall Technologies, Inc., 54 F.3d at 1578.

### III. CLAIM CONSTRUCTION IN THIS CASE

As indicated, the Court identified four terms or phrases for construction. Placed within the context of the chart submitted by the parties, those four terms are: 4. "rebate network manager"; 6. "monitor all of said debit and credit card account transaction information"; 7. "receiving . . . all the debit or credit card account transactions"; and 8. "monitoring, by a third party . . . all of said account purchase information."

### A. "*Rebate Network Manager*"

Rebate network manager appears repeatedly in each of the three patents-in-suit. For example, Claim 1 of the '572 patent claims

> 1. A method of providing a rebate program, the rebate program including registered members, registered member credit card accounts, registered member debit card accounts, and registered member rebate accounts in which to apply rebates earned by registered members, at least one registered merchant offering rebates to registered members with registered debit or credit card accounts, the method comprising:
>
> > a) at a *rebate network manager* connected to said at least one registered merchant via processors that track debit or credit card account purchases to provide debit and credit card account transaction information, receiving debit and credit card account transaction information associated with a registered merchant;

9

> b) via said *rebate network manager* operating a centralized processing system configured to monitor all of said debit and credit card account transaction information from said processors and associated with a registered merchant to determine if said transactions are consummated with registered members using said registered member card accounts, wherein said *rebate network manager's* centralized processing system is located at a location other than the location of the merchant . . .

(Docket No. 235-13, '572 patent, Col. 17 at 48 - Col. 18 at 2).  Arguing that this is one of the few terms requiring construction, Plaintiff proposes: "An entity that correlates purchases made from merchants belonging to a network with rebates offered in conjunction with the purchases.  In some cases, the rebate network manager debits a merchant account and credits an existing account (*e.g.*, higher education account)."  (Docket No. 222-1 at 2-3).  Defendants' proposed construction is: "An entity, distinct from the entity that maintains the financial account, that captures and segregates purchases that qualify for a rebate made from merchants belonging to a network."  (Id. at 2).

The language proposed by the parties is different in two significant and material respects:  (1) whether the rebate network manager captures and segregates purchases that qualify for a rebate, and (2) whether the rebate network manager is distinct from the entity that maintains the financial account.  Plaintiff claims neither is mandatory, while Defendant insists both are required by the claims.  Having fully considered the patents-in-suit and the arguments of the parties, the Court concludes that, while the patents-in-suit do not necessarily require that the rebate network manager capture and segregate qualifying purchases, they do require that the rebate network be distinct from the entity that maintains the financial account.

Plaintiff's proposed construction finds a lot of support in the specifications of the patents-in-suit.  Each provides:

10

> As used herein, the term "rebate network manager" refers to an entity (e.g., InfoSpace) that correlates purchases made from merchants belonging to a network with rebates offered in conjunction with the purchases. In some cases, the "rebate network manager" debits a merchant account and credits an existing account (e.g., higher education account).

(Docket No. 222-12, '872 patent at Col. 4:34-39; Docket No. 133-13, '572 patent at Col. 4:34-39; Docket No. 233-14, '704 patent at Col. 3:22-27).

As indicated, specifications of a patent are intrinsic evidence and thus highly probative of what a term means. In fact, they are "the single best guide to the meaning of a disputed term." Vitronics, 90 F.3d at 1582.

Clearly, the definition of "rebate network manager" supports Plaintiff's position that it need only correlate purchases (as opposed to capturing and segregating), and Defendants concede as much. They argue, however, that Tuitionfund "further described and defined '*correlating*'" during the prosecution history "by explaining that the rebate network manager '*captures and segregates*' qualifying transactions." (Docket No. 233 at 21, italics in original).

"During the process of obtaining a patent, a patentee may make statements to the Patent Office to distinguish [its] claimed invention from the prior art." BASF Agro B.V. v. Makhteshim Agan of No. Am. Inc., 2013 WL 1136714 at *6 (Fed. Cir. Mar. 20, 2012). "Where such statements indicate a clear disavowal of subject matter, the patentee disclaims such subject matter and narrows the scope of her claims." Id. This is in keeping with the idea that "[t]he public has a right to rely on representations a patentee has made in the course of obtaining her patent." Id.

Having considered the matter, the Court does not believe that Plaintiff clearly disavowed "correlate" in favor "capture and segregate." In claiming that Plaintiff did, Defendant cites a couple

11

of passages from the prosecution history, but those are far from conclusive and, in fact, at least one passage relates to an attempt to distinguish prior art. Merely providing a "an example to illustrate the difference between the invention and the prior art . . . do[es] not indicate a disavowal or disclaimer of claim scope[.]" Gemstar-TV Guid v. Int'l Trade Comm'n, 383 F.3d 1352, 1375 (Fed. Cir. 2004).

Additionally, "capture and segregate" is not used to the exclusion of "correlate" in the prosecution history, as numerous times the prosecution history describes or suggests the rebate network manager correlates purchases.[5] The existence of both the correlate and capture and segregate language suggests at most an ambiguity and this alone is not sufficient to narrow the term from that in the specification. See, Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2004) ("where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender," but the Federal Circuit "h[as], however, declined to apply the doctrine . . where the alleged disavowal of the claim scope is ambiguous.").

"The prosecution history must be considered because it may demonstrate that a patentee intended to deviate from a term's ordinary or customary meaning or that the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms." ACTV, Inc. v. Walt Disney Co.,

---

[5] For example, the prosecution history contains the following statements: "In the TuitionFund system, merchants register with a central Rebate Network Manager that correlates purchases made from merchants"; "The clearinghouse [of Lidman] does not correlate purchases made by registered customers from merchants" and in Lidman "there is no correlation of purchases by customers"; and "Schultz teaches a system for incentives offered by manufacturers, not merchants [and] there is no function of correlating purchases made by customers." (Docket No. 239-11 at 1-2).

346 F.3d 1082, 1090 (Fed. Cir. 2003). The Court finds no intent in the prosecution history to narrow the clear specification of "correlate" to "capture and segregate."

As for the question of whether the network rebate manager need be separate from the entity that maintains the financial account, Plaintiff argues this is not a requirement and again points to the specification. However, to arrive at this assertion, Plaintiff replaces "an entity (e.g. InfoSpace) that correlates purchases made from merchants" as set forth in the specification with "any entity that correlates purchases made from merchants." According to Plaintiff, the basis for these differences is that the reference to InfoSpace "is, after all, merely a parenthetical," and replacing "an" with "any" is in keeping with Federal Circuit precedent which construes an "'a' or 'an' to carry the meaning of 'one or more.'" (Docket No. 239 at 27).

The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" Baldwin Graphic Sys. Inc. v. Siebert, 512 F.3d 1338, 1342 (Fed. Cir. 2008). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention." Id. "Further, this general rule applies unless 'the language of the claims themselves, the specification, or the prosecution history necessitate[s] a departure from the rule.'" Sandisk Corp. v. Kingston Tech. Co., Inc., 695 F.3d 1348, 1360 (Fed. Cir. 2012) (quoting, Baldwin, 512 F.3d at 1342).

It is not readily apparent to the Court that "any" as proposed by Plaintiff is the equivalent of "one or more," because the latter suggests multiples of the same thing, while the former suggests the possibility of a different thing. And while "standard grammar generally provides that 'a' means

13

'any,'" Novo Nordisk A/S v. Caraco Pharm. Lab., Inc., 601 F.3d 1359, 1364 (Fed. Cir. 2010), query whether this general rule applies where, as here, an example of the thing is immediately provided in a parenthetical. In this regard, the Court does not believe that a parenthetical should necessarily be ignored simply because it is a parenthetical. See, Felix v. American Honda Motor Co., Inc., 562 F.3d 1167, 1180 (Fed. Cir. 2009) (appellant's "brief has omitted a parenthetical qualification – here, 'weapons' – that significantly limits the quoted definition"); Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1402 (Fed. Cir. 2008) ("considered in context of all of the cited prosecution history, it is unclear whether the website and email parenthetical examples are optional functions provided in addition to internet access, or whether they are offered as alternatives to the provision of internet access").

That said, a reading of the claims does not suggest anything but a separation of the network rebate manager from the money manager. To begin with, and as stated, the specification describes the rebate network manager as "an entity," and provides the specific example "InfoSpace," but also, separately defines "money manager" as "a professional financial management group" with examples given as including, but not limited to "organizations such as Charles Schwab, Fidelity, American Express, and Merrill Lynch." (Docket No. 233-12, '872 patent Col. 4, 29-39). Arguably, this does not mean that the rebate network manager and the money manager are necessarily separate, but the specifications go on to suggest that they are by describing the relationship between the rebate network manager and the money manager in some detail:

> In a preferred embodiment, the rebate monies earned by a member by participating in the TuitionFund.com program are centrally accumulated by a Rebate Network Manager 100. The rebate monies earned by the member are then directed to a

14

professional Money Manager 110. The professional Money Manager 110 may be a licensed financial agent, broker, or any firm offering financial management and brokerage services. Examples of contemplated Money Managers 110 might include, but are not limited to, the following firms offering financial services: American Express, Charles Schwab, Fidelity, or Merrill Lynch. The Money Manager 110 allocates the rebate monies earned by a particular member according to the desires of that member.

(Id. '872 Patent Col. 6:48-61; Ex. H, 572 patent at Col. 6:48-61; Ex. I, 704 patent at Col. 5:35-47).

In addition, the specifications suggest a separation of the entities, as the rebate network manager never has direct access to any financial or rebate account, but instead passes on the information to a different entity (e.g., Charles Schwab). The money manager, not the rebate network manager, is responsible for allocating the rebate monies:

The Rebate Network Manager 430 disburses the rebate sum earned by a particular Registered Member 400 from each transaction with a Registered On-Line Merchant 420, to the professional Money Manager 440 for further disbursement into the Registered Member's 400 various investment Fund and Accounts options 450 (See also FIG. 1, at 115). In preferred embodiments, the Rebate Network Manager 430 affiliate may comprise a service such as InfoSpace.com. In addition, as stated above, in particular embodiments, the professional Money Manager 440 contemplated may comprise Charles Schwab, Fidelity, American Express, or Merrill Lynch.

Ex. G, 872 patent at Col. 14:14-25; Ex. H, 572 patent at Col. 14:18-29; Ex. I, 704 patent at Col. 12:67-13:11.

The notion that the rebate manager monitors or tracks rebates and passes the information on to a separate entity is further borne out by the fact that '872 patent discloses the rebate network manager communicating via a computer to an entity that has access to the educational account. Similarly, under the '572, the network rebate manager is said to generate information necessary to credit a rebate account, with the implication being that another entity, and not the rebate network

15

manager is not responsible for crediting or maintaining any financial account in the 572 patent.

The figures and illustrations of the patents-in-suit only solidify this conclusion. In the factual background, the Court set forth Figure 4, a figure that is common to all three patents-in-suit and which shows the rebate network manager separate from the money manager. In addition, Figures 1, 5 and 6, common to each of the patents-in-suit, depict a rebate network manager that is distinct from the manager that manages the registered members' rebate account:





Patent drawings can be "highly relevant in construing" the

16

claims of a patent, CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1153 (Fed. Cir.1997).  It is true that "drawings in a patent need not illustrate the full scope of the invention," Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 632 F.3d 1245, 1255 (Fed. Cir. 2011), and "patent coverage is not necessarily limited to those inventions that look like the ones in the figures," MBO Lab., Inc. v. Becton, Dickinson & Co., 474 F.3d 1324, 1333 (Fed. Cir. 2007).  However, the Figures in this case consistently and repeatedly show the network rebate manager as being a separate and distinct entity. See, Protective Industries, Inc. v. Ratermann Mfg., Inc., 2013 WL 393466 at *5 (M.D. Tenn. Jan. 13, 2013) (noting drawings are illustrative, but finding it "significant that Figures 1 and 2 show the protective sleeve, and Figures 2B, 3, and 4 are said to be different embodiments of the sleeve, yet each and every embodiment depicted shows a sleeve which is designed to cover the valve faces and is made to conform to the shape of the faces").

Based upon the foregoing, the Court construes "network rebate manager" as "one or more entities, distinct from the entity that maintains the financial account, that correlates purchases that qualify for a rebate made from merchants belong to a network."

**B.    "*Monitor all of Said Debit and Credit Card Account Transaction Information From Said Processors and Associated With a Registered Merchant*"**

This phrase appears several times in each of the patents-in-suit.  For example, claims 1 and 24 of the '572 patent contain the following language: "said rebate network manager operating a centralized processing system configured to *monitor all of said debit and credit card account transaction information* from said processors and associated with a registered merchant."  Plaintiff proposes no construction, as the plain and ordinary meaning is clear.  Defendants propose the

17

following construction: "Review/reviewing information about each and every credit/debit transaction made with the registered merchants."

In addition to asserting that no construction is necessary, Plaintiff argues that it is improper to collectively define terms that are contained in at least nine claims. In its opening brief, Plaintiff posits what Defendants might be getting at is the "monitoring all transactions" language and the "processor" language, but the latter is clearly defined in the patents-in-suit. In response, Defendants contend that the argument about "processors" is a "red herring" as they are not contending that the transaction information must go directly from the merchant to the rebate network manager. Instead, the dispute is whether the rebate network manager must monitor all debit and credit card account transactions from the registered merchants, or only that which is received from the processors.

Plaintiff's position is supported by the claim language. And, contrary to Defendants, the Court does not read the prosecution history as necessarily requiring that the rebate network manager monitor all transactions from a registered merchant.

The previously referenced language from claims 1 and 24 of the '572 Patent speak about "transaction information from said processors." Additionally, the other claims discuss a rebate network manager that is configured to: "monitor all of said debit or credit card account transaction information *provided by said at least one processor* and associated with a registered merchant" ('572 Patent, claim 25); "monitor all of said account purchase transaction information *received from said at least one processor* and associated with a merchant" ('704 Patent, claim 35); and "monitor all of said debit and credit card transaction information *from said processors* and associated with said registered merchants" ('872 Patent claim 1). This language clearly envisions monitoring by

18

the rebate network manager of the information received from the processors.

Further, in each of the claims, "processors" is a different claim element from "rebate network manager." It is also a different claim element from "merchant." This is depicted in Figures 5 and 6 set out above. Figure 5 shows the Rebate Network Manager 530 receiving information from the Tracking Entity 525, not the Merchant 520. Similarly, Figure 6 shows the Rebate Network Manager 640 receiving information from the Tracking Entity 630, not the registered Merchants 620. Neither shows that all of the information from the Merchants is necessarily passed to the Rebate Network Manager which is in keeping with the claim terms that recite monitoring "transaction information from said processors and associated with said registered merchant," and not "each and every credit/debit transaction made with the registered merchant" as proposed by Defendants.

In arriving at this conclusion, the Court has reviewed the prosecution history and Defendant's arguments relating thereto, but is unpersuaded that further construction of the claim language is necessary. That history must be read in context and in relation to the issues being addressed.

Defendants rely on an April 24, 2004 interview summary where "the inventor, Michael Thompson, described the claimed system as one 'where the *merchant* passes *every* customer transaction to the [rebate network manager]… .'" (Docket No. 233 at 10, ellipses, italics and brackets supplied by Defendants). But the interview summary dealt with efforts to overcome prior art (Lidman) and, in context, reads:

> "Inventor Thompson described a system where the merchant passes every customer transaction to the RNM [Rebate Network Manager], the RNM being some computer other than the merchant's computer. Hence adding the limitation 'where the RNM

19

is a computer other than the merchant's computer' to claim 1 would overcome the
final rejection.

(Docket No. 239-2 at 2).

When read in context, it is clear the issue being addressed is the location of the processor that
monitors the transactions, not whether "each and every" transaction is monitored. This is further
supported by the "Request for Continued Examination and Response to Final Office Action Dated
April 27, 2004," where each of the claims was amended to recite "wherein said computer processor
is located at [a] location other than the location of the merchant." (Docket No. 293-3 at 2, 4 & 5).

Defendants also quote the following in TutionFund's "Response to Office Action Dated
December 27, 2007":

> The claimed system does not require any specialized equipment and/or software at
> the merchant's location because the merchant does not have to capture and segregate
> qualifying purchase information. Instead, *the merchant* simply transfers *all* their
> credit and debit card transactions onto their card processor as they normally do and
> the rebate network manager captures and segregates the qualifying purchase
> information.

*          *          *

> . . . No filtering or segregating outside of their normal processing of transactions are
> required by merchants participating in the claimed system. **Rather, all of the
> merchant's debit and credit card activity is monitored by the rebate network
> manager**.

(Docket No. 238 at 6, bold supplied by Defendants)

The highlighted language admittedly supports Defendants' position, but the first sentence
of the passage reveals TuitionFund was differentiating the invention based on the location of the
monitoring activity, by stating that "[t]he claimed system does not require any specialized equipment

and/or software at the merchant's location because the merchant does not have to capture and segregate qualifying purchase information [but] [i]nstead, the merchant simply transfers all their credit and debit card transactions onto their card processor as they normally do. . . ."  True, the next sentence speaks about all of the merchant's debit and credit card activity being monitored by the rebate network manager, but in the context of the preceding sentence what appears to be being argued is that the merchant need not monitor the activity, but instead need only pass it on.  As Plaintiff acknowledges, the highlighted last sentence "might not be a paradigm of precision (Docket No. 239 at 28), but for there to be a limitation, a patentee must make "a clear and unmistakable disavowal of scope during prosecution."  Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (Fed. Cir. 2008).

Defendants also provide a long list of other statements in the prosecution history, including statements in Reasons for Allowance and Determinations Ordering Reexamination.  While some of the statements talk about the Rebate Network Manager monitoring all purchase transactions of registered merchants, others do not, and some speak of the claims being tracked and monitored at a place other than the merchant's location.  Such examples include,

> "[T]he claims are considered to be patentable wherein all of the credit and/or debit card transactions of registered merchants are tracked and monitored at the card transaction processing sites and not by or at the merchant sites, in order to determine which of the transactions are from registered customers . . .

> [T]he claims are considered to be patentable wherein all of the credit and/or debit card transactions of registered merchants are tracked and monitored at the card transaction processing sites and not by or at the merchant sites, in order to determine which of the transactions are from registered customers . . . "

21

Therefore, since no additional prior art has been found which discloses these feature[s], the claims are considered to be patentable wherein all of the credit and/or debit card transactions of registered merchants are tracked and monitored at the card transaction processing sites and not by or at the merchant sites, in order to determine which of the transactions are from registered customers; thus, entitling them to rebate processing.

(Docket No. 238-10).

Notices of Allowances which state that "all of the credit and/or debit card transactions of registered merchants are tracked and monitored at the card transaction processing sites and not by or at the merchant sites" suggest that the tracking could occur at a credit card processing center or banking facility and, conceivably, only those transaction processed by a credit card processing center might be monitored by the rebate system manager. While it might be that the patent-in-suit really envisions that the rebate system manager monitor all of the transactions of a participating merchant, neither the claim language at issue, or the prosecution history related thereto, mandates that result. As such, the Court will not construe the phrase as requiring the review of information about each and every credit/debit transaction made with the registered merchants as requested by Defendants.

Based upon the foregoing, the phrase "monitor all of said debit and credit card account transaction information from said processors and associated with a registered merchant" will be given its plain and ordinary meaning. No further construction is necessary, as each of the words and terms are readily understandable by those unskilled in the art.

**C. "*Receiving . . . all the Debit or Credit Card Account Transactions*"**

This language is virtually identical with that previously discussed, except that receiving

22

appears in place of monitoring.  The language appears in claim 15 of the '572 patent as a part of "the method comprising. . . *receiving* using a rebate network manager processor, transaction information for a registered merchant, said transaction information including *all the credit or debit card account transactions* provided by said at least one processor for the registered merchant."  (Docket No. 235-15 at 19).  It also appears in claim 22 of that patent as a part of the system comprising

> a plurality of networked processors configured to:
>
> *receive* transaction information for a registered merchant, said transaction information including *all the credit or debit card account transactions* provided by said processors for the registered merchant. . .

(Id. at 19).

Plaintiff insists that no construction is needed as the plain and ordinary meaning controls, while Defendants construe the phrase to mean "receive/receiving information about each and every credit/debit transaction made with registered merchant(s)."  (Docket No. 222-1 at 7).  Both parties also agree, however, that the question here about whether the rebate network manager must receive each and every credit/debit transaction from registered merchants is driven by the answer to the question of whether the rebate network manager must monitor each and every transaction by the merchant.  Since the Court has answered the question in the negative and since the claim language is otherwise clear, no further construction is necessary.

**D.  "*Monitoring, by a Third Party . . . all of Said Account Purchase Information*"**

This phrase appears in Claim 1 of the '704 patent which reads:

1. A method of providing a rebate program, the method comprising:

enrolling at least one member account;

23

associating at least one rebate account with each enrolled member;

having at least one merchant funding rebates for purchases made with an enrolled member account, said rebates being calculated based upon an established formula or sales incentive;

receiving account purchase transaction information associated with a merchant funding rebates from at least one processor that tracks account purchases to provide account purchase transaction information;

*monitoring, by a third party*, via at least one processor located at a location other than the location of the merchant, *all of said account purchase information* associated with a merchant funding rebates received from said at least one processor that tracks account purchases to determine whether or not the purchase transactions were consummated using an enrolled member account and qualified for a rebate; and

applying a member's earned rebate monies to at least one rebate account associated with the member.

(Docket No. 235-14 at 17). Again, Plaintiff argues that no construction is necessary, while Defendants claim the proper construction is: "Reviewing information by an entity other than the rebate network manager, about each and every credit/debit transaction made with the registered merchants, and determining (1) whether each transaction was consummated with an enrolled member account and (2) whether each transaction qualified for a rebate." (Docket No. 222-1 at 8).

Here again, the dispute is about whether each and every credit/debit transaction must be monitored by the rebate network manager, albeit with an additional twist. Unlike those claims already discussed, this one speaks about monitoring by a third party.

Defendants propose that "third party" be defined as "an entity other than the entity(ies) that

24

performs the remaining steps of the claim." (Docket No. 233 at 15).[6] They argue:

> . . . By definition, the "third party" must be different from the entity that practices the rest of the claim. Claim 1 of the 704 patent affirmatively requires, among other things, (1) enrolling at least one member account, (2) associating at least one rebate account with each enrolled member; (3) receiving account purchase information, and (4) applying a member's earned rebate monies to at least one rebate account. Although there is no specific party identified that must perform these four steps, monitoring step specifically requires performance by the "third party." The third party must be different from the entity that performs the other four steps disclosed in claim 1 of the 704 patent.

(Docket No. 23 at 15-16).

It is unclear why, "by definition" a third party must necessarily be different from each of the identities listed in the claim. No such language is specifically required by the plain language of the claim, and Defendant points to nothing in the prosecution history which indicates that the third party must be different from the other entities. Conceivably, the monitoring of information by a third party of purchase information requirement is met if the one doing the monitoring is an entity other than the merchant. In the absence of any compelling reasons, the Court will not further define this claim as both "third party" and the other terms are easily understandable by a jury.

---

[6] This is the proposed construction set forth in Defendants' initial brief. In the claim construction chart submitted by the parties, the third party is defined as "an entity other than the rebate network manager." (Docket No. 222-1 at 8).

### IV. **CONCLUSION**

The Court need go no further at this point and will enter an Order confirming the claim construction set forth herein.

_Kevin H. Sharp_

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE